## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**GUATEMION "JUAN"**
**MOSLEY,**

        Plaintiff,

v.

**PRESTON CYCLES WEST, LLC**
**d/b/a THUNDER TOWER WEST**
**HARLEY-DAVIDSON,**

        Defendant.

**Civil Action File No:**
1:19-CV-03937-SCJ-JSA

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW**, Guatemion "Juan" Mosley ("Plaintiff", "Mr. Mosley" or "Juan"), by and through his undersigned attorney to file this responsive brief in opposition to Defendant Preston Cycles West, LLC d/b/a Thunder Tower West Harley-Davidson ("Defendant", "Preston" or "the Dealership") showing that they are numerous disputed material facts concerning Plaintiff's claims against Defendant for sexual harassment, retaliation for engaging in protected activity, and his racially motivated termination from employment in violation of Title VII of the Civil Rights Act of 1964   42 U.S.C. 2000e *et. seq.* ("Title VII"). Plaintiff's

complaint also brings a concurrent race, color and ethnicity based discrimination claim against Defendant in violation of 42 U.S.C. §1981 ("Section 1981").[1] Because there are several disputed material facts concerning these claims that do not result in judgment of the law in favor of Defendant, for this reason and other reasons set forth herein below Defendant's motion for summary judgment should be denied in its entirety.

## I.   STATEMENT OF FACTS

### A.  Mr. Mosley was the top selling Motorcycle Salesperson at the Dealership during his first six months on the job.

Mr. Mosley is an African American male who began working for Preston on or about April 10, 2017 as a full-time employee Motorcycle Sales Associate at its Thunder Tower West Harley-Davidson dealership located in Morrow, Georgia. (G. Preston Dep. p. 13). Plaintiff was a stellar Motorcycle Sales Associate. In his first six months the on job, he became the top-selling Associate at the dealership. (Moon Aff ¶5 and G. Preston Dep. p. 30:10-15). Remarkably, during this short period of time, by October of 2018, he sold 98 units, having a sales list price of $2,029,969.73. (G. Preston Dep. p. 23 and Exh. 3). The 98 units sold by Plaintiff generated a gross profit to Preston of $368,982.42. (G. Preston Dep. p. 23 and Exh.

---

[1]For purposes of this brief Plaintiff relies on same facts and argument concerning his Title VII claim for his Section 1981 claim.

3) Plaintiff's performance as a motorcycle salesperson was superb. He was projected to single-handedly generate close to $750,000 in gross profit for Preston for the year.

**B. <u>Mr. Mosley was an exceptional employee with a promising future at the Dealership until it was thwarted by retaliatory and racial animus.</u>**

Clarence Moon, the Dealership's sales manager who managed Mr. Mosley and other motorcycle sales associates described Mr. Mosley as an "exemplaray employee" (Moon Aff ¶5). The owner of the Dealership, Gene Preston, describes Mr. Mosley as a very intelligent and very articulate young man. (G. Preston. Dep. 49:19-21).   Despite these high accolades and a promising future, Mr. Mosley's career longevity at the Dealerhisp was curtailed because he engaged in activity protected by Title VII and as a result of Defendant hiring an openly racist General Manager, Jeff Lewis, in March of 2018 who iniated the termination of Mr. Mosley's employment at the dealership in April of 2018. (Hammers Dec., ¶ 28; G. Preston Dec., ¶ 24; Chambers Dep. p. 36:5-23, Davis Aff. ¶4-6; Previte Dep. pp. 11 and 17-21).

**C. <u>Mr. Mosley reports to the Dealership that he was being threatened and felt harassed by the General Sales Manager Robert Hammers.</u>**

In December 2017, the Dealership, through Mr. Hammers completed an evaluation of Mr. Mosley's performance as an employee. Mr. Mosley had completed the probationary period and he was a permanent employee. (Hammers Aff. Exh. E, p. 1).   In the 14 performance areas, Mr. Mosley received one (1) exceeds requirments, seven (7) meets requirements,  six (6) needs improvement and zero (0) unsatisfactories.  (Hammers Aff. Exh. E). Notably, Mr. Mosley received an exceeds requirements concerning his knowledge of required skills, which meant that he has exhibited "the mastery of the skills that are necessary to performe services required of the position." (Hammers Aff. Exh. E, p. 1).  In his December 2017 Evaluaiton he also received  a "meets requirements" concerning attendance, which meant that he demonstrated "good observance of working hours with only minimal absences from work." (Hammers Aff. Ex. E, p. 1). Moreover, he also received a meets requirements concerning punctuality, which meant that he "adheres to arrival, break time and departure times." (Hammers Aff. Ex. E, p. 1).

Although there were categories marked on Mr. Mosley's Evaluation for "needs improvement"; significantly, per the form the Dealership was

required to prepare a written plan for improvement. (Hammers Aff. Ex. E, p. 1). It failed to prepare and provide Mr. Mosley with any written plan of improvement concerning the purported issues it had with his job performance; accordingly, it had no objective basis for ascertaining whether or not there were any improvments to Mr. Hammers' alleged concerns about Mr. Mosley's job performce.   Moreover, Mr. Mosley took issue with some of the comments directed at him from Mr. Hammers, because they seemed personal, so on the Evaluation form he noted that he was feeling <u>threatened</u> and <u>harassed</u> by Mr. Hammers. (Hammers Aff. Ex. E, p. 2).

### D.    <u>Sexual Harrassment</u>

Mr. Mosley was sexually harassed by the Dealership's Motor Clothes Sales Manager Monique Perry and Defendant failed to exercise reasonable care to prevent and promptly correct her harassing behavior.

### 1.    Ms. Perry served in the capacity of a supervisor at the Dealership.

In November of 2017 Defendant hired Ms. Perry as its General Merchandise Manager a.k.a. Motor Clothes Sales Manager. (Chambers Dep. Exh. 16).  As  Motor Clothes Sales Manager Ms. Perry shared duties of

this position with Ms. Preston. (Chambers Dep. Exh. 16; B. Preston Dep. p. 8:18-25). As a manager Ms. Perry was authorized to sit on hiring panels that required a unanimous consensus to hire an employee. (G. Preston Dep. p. 14:13 - 15:20; Davis Aff. ¶11).  As a manager autorized to be a member of a hiring panel that required a unanimous agreement, Ms. Perry had hiring authority for the Dealership and effectively served in the capacity of a supervisor. (G. Preston Dep. p. 14:13 - 15:20).  As  Motor Clothes Sales Manager, Ms. Perry had dual authothority, with Ms. Preston, to discipline emnployees. (B. Preston Dep. p. 26:25 - 27:8).

### 2. Ms. Perry engaged in pervasive or severe sexual harassment against Mr. Mosley.

Between on or about December 13, 2017 and January 5, 2018 Ms. Perry sent sexually harassing text messages to Mr. Mosley, whose humiliation, offense, and embarrassment, was exacerbated by the fact that Ms. Perry shared the message with his co-workers while engaging in this behavior.  Ms. Perry's conduct went on for close to two weeks, all the while not only did she sexually harass Mr. Mosley, but she taunted him by never revealing her identity.

In response to a group text message, Mr. Mosley sent a message asking "Who is this" in order to identify a phone number. In response, on December 13, 2017, Monique Perry sent a text message to Mr. Mosley stating "I don't know why you sent me these pictures can you ride a deer???? I can't believe you don't remember me after all the things we did (eggplant emoji, peach emoji, dinner plate emoji, and water or wet symbol emojis)" (See Mosley Dep. pp. 209-210 and Exh. 7).

Not knowing who the text message was from Mr. Mosley's response to the message was "Huh?" to which Ms. Perry responded "How u gonna forget like that . . .It wasn't memorable for me neither that's why I didn't call". (See Mosley Dep. p. 211 and Exh. 7). Next, Mr. Mosley responded "Shidd you a damn lie" to which Ms. Perry responded by sending a picture of a can of Vienna sausages and message stating "And it wasn't that damn cold". (See Mosley Dep. Exh. 7); Mr. Mosley then responded asking who it was, but Ms. Perry did not reveal herself, instead she responded by sending a fully nude picture of an African-American transsexual with an erection and a message stating "Do u remember now?????" (See Mosley Dep. p. 110:13-21, 211, Exh. 7).

Prior to sending the text messages to Mr. Mosley between December 13, 2017 and January 5, 2018, Ms. Perry had previosly began her campaign of

sexually harassing Mr. Mosley.  On one occasion after seeing a female customer walk through the door, she made a statement to Mr. Mosley asking him "Is that one of your hoes too?". (Mosley Dep. p. 122:23 – 123:10). On another occasion prior to the text messages, after seeing Mr. Mosley yawn and stretching she commented to him "[y]ou shouldn't be having those all-nighters." (Mosley Dep. p. 123:13-17). To add insult to injury, while she was sending out sexually harassing messages to Mr. Mosley, she mocked and taunted him with co-workers. At his deposition, Mr. Mosley testified "[you got my coworkers looking at me weird . . .   I mean, you got, you are showing this stuff to my coworkers, Kandy and Dana. I'm not someone's play toy. I come to work to work. I don't come to send text messages to my coworkers. That is humiliating and degrading." (Mosley Dep. p. 112).

The text messages sent by Ms. Perry were unquestionably pervasive and/or severe. At his deposition the owner of the Dealership, Gene Preston testified that although he never personally saw the text messages,  during a meeting held on or about January 8, 2018, the Monday after he received notification of the text message "no one disagreed that texts had been sent and that they were inappropriate and so [he] did not ask to see them. There was no

item of contention there. Juan said they were inappropriate. The person that was responsible for them said they were inappropriate. And so I accepted that that was the basis for us to have a  further discussion about them." (G. Preston Dep. p. 44:15-25)

### 3.     Mr. Mosley reported  Ms. Perry's sexual harassment to Human Resources.

On Friday, January 5, 2018, Mr. Mosley filed a complaint of sexual harassment against Monique Perry, the Dealerships Motor Clothes Sales Manager. (Plaintiffs Depo., pp. 107-111, Defendant's Exh. 15; Chambers Depo., pp. 24-25, Plaintiffs Exh. 6). Mr. Mosley filed his Complaint via e-mail to Jeanne Chambers, the Dealership's Human Resources Manager. (Chambers Depo., pp. 24-25, Plaintiffs Exh. 6).

On January 8, 2018 Ms. Chambers, travelled from the South Carolina location to the Morrow, Georgia location and held  an individual meeting with Monique Perry and with Juan Mosley and then a group meeting where Gene Preston, Betty Preston, Robert Hammers, Leonard Baker, Juan Mosley and Monique Perry were all in attendance. (Chambers Dep. p. 25:20 – 26:3). During the meeting, they addressed Mr. Mosley's accusations of sexual harassment with

Monique Perry and she admitted to having sent inappropriate text messages and

pictures." (Chambers Dep. p. 25:20 – 26:3 and Exh. 8).

> **4. Ms. Preston was aware of Ms. Perry's sexual harassment of Mr. Mosley before he reported it to Human Resources, but she failed to exercise reasonable care to prevent and promptly correct her harassing behavior towards Mr. Mosley.**

Kandy Branch, a co-worker at the Dealership, was the first to inform Mr.

Mosley that the text messages he was receiving were from Monique Perry. When

broaching the subject, Ms. Branch said to Mr. Mosley "what I'm going to tell

you, you are not going to like." (Mosley Dep. p. 109:24-25). When telling Mr.

Mosley that the text messages were coming from Ms. Perry she notifed Mr.

Mosley that she told Ms. Perry that Mr. Mosley would not view the messages as

funny. (Mosley Dep. 110:4-7). Ms. Branch also told Juan that she notified Betty

Preston about Ms. Perry's sexually harassing text messages while she was at

lunch with Ms. Preston and another co-worker, Dana. (Chambers Dep. Exh. 6,

¶1). After Ms. Branch told Juan that she notified Ms. Preston about Ms. Perry's

sexually harassing conduct, in his internal Complaint, Mr. Mosley reports "[a]fter

I heard that I figured I would be pulled into the office to discuss this but I wasn't

and it really bothered me and made me feel violated and worthless." (Chambers

Dep. Exh. 6, ¶1).

**5. Ms. Betty Preston, held herself out as an owner of the Dealership and she also served in the capacity of supervisor at the Dealership.**

Betty Preston, Gene Preston's wife, regularly represented to  customers and

employees that she was as an owner of the Dealership. (B. Preston Dep. p. 7:23 –

8:4; Chambers Dep. p. 43:22 – 44-5 and Exh. 16; Moon Aff" ¶9). Moreover, Ms.

Preston served as the manager of the motor clothes department at the Dealership

and did so dually with Ms. Perry once she was hired. (B. Preston Dep. pp. 8 and

26:25 - 27:8; Davis Aff. ¶11; ). As a manager of this department Ms. Preston

would sit on a hiring panel at the Dealership that required a unanimous consensus

to hire an employee. (G. Preston Dep. p. 14:13 - 15:20; Davis Aff. ¶11). As a

manager of this department, who sat on a hiring panel that required a unanimous

decision, Ms. Preston had hiring authority for the Dealership.  (B. Preston Dep. p.

24:3-6).

**E.  On or about February 20, 2018 Mr. Mosley was suspended for five days without pay for missing work even though he called in to report that he was having car trouble.**

In his December 2017 evaluation, Mr. Mosley received a "meets requirements" concerning attendance (i.e. – demonstrating good observance of working hours with only minimal absences from work). Nonetheless, just two months after reporting feeling underline threatened and underline harassed by Mr. Hammers, Mr. Hammers issued a underline five-day suspension without pay to Mr. Mosley for missing work, despite the fact that he called in to report having car truoubles. (Hammers Dec., ¶ 27, Exh. H; G. Preston  Dec., ¶ 23,  Exh. D; Plaintiff's Depo., pp. 128-133,  Defendant's  Exh.  19;  Chambers  Depo.,  pp.  19- 20).  The Dealership's written attendance policy specifically "states employees who will be late to or absent from work should notify their manager in advance or as soon as possible in the event of an emergency." (Chambers Dep. pp. 21-22; Exh. 12, p. 1).  Mr. Mosley was required to report to work between 8:30 a.m. and 9:00 a.m. on February 17, 2018 and he called in around 10:10 a.m. that day in accordance with the Dealership's attendance policy, yet he was still disciplined by Mr. Hammers an unpaid 5-day suspenson. (Chambers Dep. Exh. 11).

**F. In March of 2018, Defendant hired Jeff Lewis to be the Dealership's General Manager.  Mr. Lewis immediately began engaging in a series of overtly racist behavior toward and concerning African-Americans which culminated in the termination of Mr. Mosley's employment on the basis of or**

**motivated by race and/or race related protected characteristics.**

In March 2018, Mr. Preston hired Jeff Lewis to be the Dealership's General Manager. (Hammers Dec., ¶ 28; G. Preston Dec., ¶ 24). As General Manager of the Dealership, Mr. Lewis was the Dealership's operator and he was responsible for all departments within the dealership. (G. Preston Dep. p. 27:10-15; B. Preston Dep. p. 25:6-14; Mosley Dep., p. 150:23 – 151:4). As General Manager, Lewis operated the Dealership on a day-to-day basis. (Davis Aff. ¶3).

Mr. Preston had a "hands off" approach to his management of the Dealership. (Mosley Dep., p. 150:23 – 151:4). For example, Mr. Preston did not regularly review the sales of motorcycles associate. (G. Preston Dep. p. 27:2-9). Mr. Preston also did not approve the final sales tally for motorcycle sales associates, necessary for the payment of their commissions. (G. Preston Dep. p. 29:11-20).

1.  **Mike Davis' personal observations of Mr. Lewis overtly racist and bigoted behavior toward, against and concerning African-Americans**.

From the beginning and throughout his employment at the Dealership, Mr Lewis engaged in a series of overtly racist and bigoted behavior toward,

13

against and concerning African American employees and customers.  Motorcycle sales associate Mike Davis observed that while working with Mr. Lewis he personally heard Mr. Lewis make many racially offensive and demeaning statements about and toward black employees at the dealership.  He personally heard and specifically recalls Lewis regularly saying that sales manager Leonard Baker, an African-American male, and Juan Mosley, also African American male, were 'shucking and jiving' to describe various work they were performing at the dealership.  Mr. Davis also observed Lewis insulting Juan by saying that he looked like someone from the street because of the loose and baggy clothes that he wore to work.  Mr. Davis also heard Lewis called Juan "homeboy" and said that he was blacker than the rest of African-American employees because he was acting like a street person. (Davis Aff. ¶4)

Mr. Davis also observed, on several occasions, Mr. Lewis being very condescending, dismissive, and crass towards Juan.  Any chance that he could take a dig at Juan he would insult him and berate him for minor and trivial things.  Mr. Davis described Mr. Lewis' conduct as "horrible." (Davis Aff. ¶5).  Mr. Davis also personally heard Jeff Lewis repeatedly make derogatory statements about black customers having bad credit.  Davis specifically remembers Lewis referring to a black customer as a "credit criminal". (Davis Aff. ¶6).

14

### 2. Tammie Landis' personal observations of Mr. Lewis overtly racist and bigoted behavior toward, against and concerning African-Americans.

On May 25, 2018, Dealership employee Tammie Landis filed a complaint with Human Resources stating "it pains me to send this correspondence. I'm in Sales and made a mistake on the job recently. As I was assisting a co-worker with a sale, I let the customer leave the store before the sale was complete. My sales manager Leonard gave me some immediate corrective instruction which I greatly appreciated. My GM Jeff, however, did not offer the same. Instead, Jeff [Lewis] asked me if the customer was white or black. I'm unsure if he was insinuating that race would play a part of whether or not the customer would actually be back or if race determined if he lived in the area. Either way, I was deeply offended by his racial profiling and found it difficult to maintain my professionalism in that moment". (Mosley Dep. Exh. 27, p. 1; Previte Dep. p. 29).

### 3. Jameson' Previte's personal observations of Mr. Lewis overtly racist and bigoted behavior toward, against and concerning African-Americans.

Jameson Previte, a Caucasian employee of the Dealership who worked as its Financial Services Manager personally heard Lewis say, the day after Mr. Mosley was terminated,  that Juan wanting to wear FUBU to work every day was a reason for his termination. (Previte Dep. p. 11:5-15).  During his employment at

15

the dealership, Mr. Previte witnessed Mr. Lewis frequently asking Ms. Landis about the race of a customer. Previte attests, "[v]ery frequently a customer would have to require paystubs in order to prove to the bank that they were the employee of that income. I heard Jeff ask one of the sales manager,[ ]Tammy what the color of the customer's skin was. You know, he was trying to infer, based that on whether or not the customer was reliable enough to come back or produce the paystubs." (Previte Dep. p. 11:17-12:10). Previte further attests that Lewis even criticized him for dressing or looking too much like an African-American. Previte states that on one occasion "he was corner[ed] on the way out of the bathroom by [] Lewis and Lewis essentially physically blocked him from passing and then told [Previte that his] clothing did not fit the culture of the dealership, and that [he] looked like one of [the Dealership's] customers, which was a predominately African-American customer base. (Previte Dep. p. 17-18 and 20-21).

### 4.   Lewis' termination of Mr. Mosley's employment.

In April of 2018, less than two months into his position as Genearl Manager, Mr. Lewis initated the termiation of Mr. Mosley's employment by first contacting the Human Resources manager. (Chambers Dep. p. 36:5-23). On April 18, 2018 Mr. Mosley was notified of his termination,  in a meeting at the Dealership,  by Mr. Hammers and Mr. Lewis. On the day he was called into the meeting with Mr.

Hammers and Mr. Lewis, Mr. Hammers told Mr. Mosley "we are letting you go" and when Mr. Mosley responsed "why?", Mr. Hammers responded "we are moving in a different direction". Mr. Mosley then said "What did I do? Mr. Hammers responded "you didn't do anything. We are just moving in a different direction." (Mosley Dep. p. 156:3-70). Mr. Mosley' termination letter provides no reason whatsover for his termination. (Mosley Dep. Exh. 20).

## II.   ARGUMENT AND CITATION OF AUTHORITY

### A.   Motion for Summary Judgment Standard

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 175 (1970); Bingham, Ltd. v. United States, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party. Once the

moving party has adequately supported its motion, the nonmoving party  must come forward with specific facts that demonstrate the existence of a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there  is  a  genuine issue for trial." Celotex, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could  return  a  verdict  for  the nonmoving  party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 242 (1986). The standard for summary judgment mirrors that for a  directed  verdict: "whether  the  evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 259. In the instant matter Plaintiff has presented a significant amount of competent evidence designating specific  facts  showing  that there are genuine issues for trial concerning his claims.

### B.  Defendant's motion for summary judgment concerning Plaintiff's Title VII Sexual Harassment Claim Should be Denied.

To establish a prima facie claim of harassment under Title VII, a plaintiff must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee . . . ; (4) that the harassment was sufficiently severe

or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275; see also Lara v. Raytheon Tech. Serv. Co., LLC, 476 F. App'x 218, 220-221 (11th Cir. 2012). To demonstrate the fourth prima facie element, a plaintiff must show that his work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal citations and quotation marks omitted).  "To evaluate the objective severity of the alleged harassment, [courts] look to: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance."  Lara, 476 F. App'x at 221.

The record evidence clearly shows that elements (1) through (3) are present. As to element (4) Plaintiff has presented a significant amount of competent evidence that Ms. Perry's comments were not merely isolated, teasing off handed comments.  They started prior to the two week period when her sexually expelicit

texts began. Mr. Mosley's co-worker, Kandy Branch, recognized the seriousness of the text messages when she approached Mr. Mosley to tell him. (Mosley Dep. p. 109:24-25). Moreover, the text messages were circulated at the workplace which resulted in Mr. Mosley's ridicule and insult. Mr. Mosley describes feeling humiliated and degraded by Ms. Perry's conduct. (Mosley Dep. p. 112). Even the owner of the Dealerships, Mr. Preston, acknowledged that Ms. Perry's conduct was objectively severe. (G. Preston Dep. p. 44:15-25).

Next, with regard to the fifth element, Defendant is responsible for Ms. Perry's harassment pursuant to a theory of vicarious liability, because Ms. Preston (who  presented herself as an owner of the dealerhisp, and also served as a manager at the dealership) was aware of the Ms. Perry's sexual harassment, but she failed to exercise reasonable care to prevent and promptly correct Ms. Perry's harassing behavior. Moreover, the harasser, Ms. Perry was a supervisor as she possessed the power to hire through her authority as a panel member.  He authority to discipline employees also gave her supervisory authority.

The Supreme Court has held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the

employee." Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998); see also Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998).  A defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." Id. The defense comprises of two necessary elements: (1) the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee failed to take advantage of protective or corrective opportunities.  A defendant "bears the burden of proof on its affirmative defenses, its status as the summary-judgment movant requires it to establish there is no genuine dispute of material fact as to all of the elements of its affirmative defense and, concomitantly, that it deserves judgment as a matter of law on the defense." See Williams v. United Launch Alliance, LLC, 286 F. Supp. 3d. 1293, 1307 (2018) (citiing Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  Here, the Dealership cannot meet this burden, that is it cannot show that there is no genuine dispute of material fact as whether Ms. Preston was aware of Ms. Perry's sexual harassment and did not fail to exercise reasonable care to prevent and promptly correct her harrassing behavior.  Indeed there is record evidence that after learning of her behavior Ms. Preston did nothing.  In his internal Complaint, Mr. Mosley reports

"[a]fter he heard that Ms. Branch notified Ms. Preston about Ms. Perry's sexually harassing conduct, he figured it would be addressed,  when it  wasn't  it really bothered him and made [him] feel violated and worthless. (Chambers Dep. Exh. 6, ¶1).

### C.  Defendant's motion for summary judgment concerning Plaintiff's Title VII claim of retaliation Should be Denied.

Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation, "a plaintiff must show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression."  Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998); see Watkins v. Sec'y Dep't of Homeland Sec., 401 F. App'x 461, 467 (11th Cir. 2010).

Absent direct evidence of retaliation, a plaintiff may rely on circumstantial evidence under the burden-shifting framework of McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973).  See Watkins, 401 F. App'x at 466.  "Under this framework, when the plaintiff presents only circumstantial evidence of a retaliatory motive, the plaintiff bears the burden to present evidence of each element of his prima facie case.  If the plaintiff does so, the burden shifts to the employer to proffer a non-retaliatory reason for the adverse action, after which the burden shifts back to the plaintiff to show that the reason is pretext for retaliatory conduct."  Bush v. Raytheon Co., 373 F. App'x 936, 940 n.6 (11th Cir. 2010).

Here, Mr. Mosley satisfies a prima facie case of retaliatory suspension. In comments to his work evaluation that he signed on December 15, 2017 he complained that he was being threatened and harassed by Mr. Hammers about a work matter for personal reasons. (Hammers Aff. Ex. E, p. 2). On February 20, 2018, less than two months later, Mr. Hammers issued Mr. Mosley a 5-day unpaid suspension for missing work, even though he called in as required to by the Dealerhip's policy. Defendant has not and cannot meet the burden of offering a non-retaliatory reason for this adverse action. Even it can offer a reason, it is pretext given Defendant's failure to comply with its own policy on this issue. See Connor v. Sun Trust Bank, 546 F.Supp. 2d 1360, 1374-75 (ND. Ga. 2008) (holding that an employer's failure to follow its own policies can be evidence of

pretext concerning an employment discrimination claim); see also Hurlbert v. St.

Mary's Health Care System, Inc., 439 F.3d 1286, 1299 (11th Cir. 2006).

### D.   Defendant's motion for summary judgment concerning Plaintiff's Title VII and Section 1981 race based discriminatory termination claims Should be Denied.

Plaintiff can succeed on a mixed-motive claim by showing that illegal bias,

such as bias based on race, "was a motivating factor for" an adverse employment

action, "even though other factors also motivated" the action.  See 42 U.S.C.

§2000e-2(m). Moreover, Plaintiff can also succeed on single-motive claim, under

the McDonnel-Douglas standard which require a showing that bias was the true

reason for the adverse action. See Suber v. Lowes Home Center, 2020 WL

5050634 (July 20, 2020).   Additionally, Mr. Lewis statement to Mr. Previte that

Mr. Mosley was terminated for wearing FUBU clothing, also serves as direct

evidence of discrimination.

Here, Plaintiff has presented a significant amount of competent evidence

designating specific facts showing that there are genuine issues for trial on his

race discrimination claims both under a mixed motive, single motive and direct

evidence analysis.  As described above, Defendant's General Manager engaged in

a series of overtly racist behavior toward and concerning African-Americans

which culminated in the termination of Mr. Mosley's employment. Significantly, Mr. Mosley' termination letter provides no reason whatsoever for his termination[2] and no reason was provided to him during his termination notification meeting. (Mosley Dep. p. 156:3-70 and Exh. 20).

### III.   CONCLUSION

Based upon the foregoing facts, arguments and citations of authority, Plaintiff respectfully requests that this Court deny Defendant's motion for summary judgment in its entirety and submit Plaintiff's claims to a jury.

Respectfully submitted this 4th day of December 2020.

**HKM EMPLOYMENT ATTORNEYS LLP**

By: s/ *Jermaine A. Walker*

Jermaine "Jay" A. Walker
HKM Employment Attorneys LLP
3355 Lenox Road, Suite 660
Atlanta, Georgia 30326
(telephone) 404-301-4020
jwalker@hkm.com
Georgia Bar No. 142044

---

[2] Notably, in the termination letter provided to Jameson Previte, detailed reasons were given for Previte's termination, yet no such reasons were stated in Mr. Mosley's termination letter. (Previte Dep. Exh. 4). Defendant cannot now rely on supposed legitimate non-discriminatory reasons, after the fact, when it had an opportunity to present them but chose not to do so.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **GUATEMION "JUAN" MOSLEY,** | |
| Plaintiff, | |
| v. | **Civil Action File No:** 1:19-CV-03937-SCJ-JSA |
| **PRESTON CYCLES WEST, LLC d/b/a THUNDER TOWER WEST HARLEY-DAVIDSON,** | |
| Defendant. | |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 4, 2020, I electronically filed **<u>PLAINTIFF'S BRIEF IN  OPPOSITON TO DEFENDANT'S   MOTION FOR SUMMARY JUDGMENT</u>** with the Clerk of Court using the CM/ECF system with the Clerk of Court using the CM/ECF system, which will automatically send email notification to the following attorney of record:

Meredith Riggs Guerrero, Esq.
Drew Eckl & Farnham, LLP
303 Peachtree Street NE, Suite 3500
Atlanta, Ga  30308
mguerrero@deflaw.com

This is to further certify that the foregoing document was prepared using 14 point Times New Roman font.

This 4th day of December 2020.

**HKM EMPLOYMENT ATTORNEYS LLP**

By: s/ *Jermaine A. Walker*

Jermaine "Jay" A. Walker
HKM Employment Attorneys LLP
3355 Lenox Road, Suite 660
Atlanta, Georgia 30326
(telephone) 404-301-4020
jwalker@hkm.com
Georgia Bar No. 142044