IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| GUATEMION (JUAN) MOSLEY, | : | CIVIL ACTION NO. |
| | : | 1:19-CV-3937-SCJ-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PRESTON  CYCLES  WEST,  LLC | : | |
| *d/b/a* Thunder Tower West Harley- | : | |
| Davidson, | : | **FINAL     REPORT     AND** |
| | : | **RECOMMENDATION    ON    A** |
| Defendant. | : | **MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Guatemion "Juan" Mosley filed this employment discrimination action on August 31, 2019. Plaintiff claims that Defendant Preston Cycles West, LLC subjected him to a sexually hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq.*, and that it retaliated and discriminated against him in violation of Title VII and the Civil Rights Act of 1866, 42 U.S.C. § 1981. The action is before the Court upon Defendant's Motion for Summary Judgment [59]. For the reasons explained below, the Court **RECOMMENDS** that Defendant's motion be **GRANTED IN PART AND DENIED IN PART** and that judgment be entered in Defendant's favor on all of Plaintiff's claims except those alleging that Plaintiff was terminated on the basis of his race, which should be allowed to proceed to trial.

## I.   FACTS

Unless otherwise indicated, the Court draws the facts stated herein from Defendant's "Statement of Undisputed Material Facts as to Which No Genuine Issue Exists" [59-2] ("Def. SMF") and Plaintiff's "Responses and Objections to Defendant's Statements of Undisputed Material Facts" [67] ("Pl. Resp. SMF"). Where appropriate, the Court directly cites to underlying exhibits filed by the parties.

Under the Local Rules, the Court must deem admitted those facts submitted by Defendant that are supported by citations to record evidence, and for which Plaintiff has not expressly disputed with citations to record evidence. *See* LR 56.1(B)(2)(a)(2), NDGa ("This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1(B)(1).").

Accordingly, for those facts submitted by Defendant that Plaintiff has failed to dispute with citations to record evidence, the Court must accept the facts as true, so long as the facts are supported by citations to record evidence, do not make credibility determinations, and do not involve legal conclusions. *See E.E.O.C. v.*

*Atlanta Gastroenterology Assocs., LLC*, No. CIV. A. 1:05-CV-2504-TWT, 2007 WL 602212, at *3 (N.D. Ga. Feb. 16, 2007). The Court has nevertheless viewed all evidence and factual inferences in the light most favorable to Plaintiff, as required on a defendant's motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

The Court has excluded assertions of fact by either party that are clearly immaterial, or presented as arguments or legal conclusions, and has excluded assertions of fact unsupported by a citation to admissible evidence in the record or asserted only in a party's brief and not in its statement of facts. *See* LR 56.1(B)(1), NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."); *see also* LR 56.1(B)(2)(b) (respondent's statement of facts must also comply with LR 56.1(B)(1)). Nevertheless, the Court includes certain facts that are not necessarily material, but which are helpful to present the context of the parties' arguments. The Court will not rule on each objection or dispute presented by the parties and will discuss those objections and disputes only when necessary to do so regarding a genuine dispute of a material issue of fact.

Defendant is a Georgia corporation, owned by Gene Preston, that owns and operates a Harley-Davidson motorcycle dealership in Morrow, Georgia. Def. SMF at ¶¶ 1–2. On April 12, 2017, Defendant hired Plaintiff to work as a Motorcycle Sales Associate ("MSA") upon the reference of Plaintiff's cousin, who had worked at the dealership for several years. Def. SMF at ¶¶ 12, 14. Plaintiff was interviewed and hired via a system in which candidates of interest were interviewed by a panel that included Preston and "non-involved managers." Pl. Resp. SMF at 13; Preston Dep. [59-3] at 14–15. Defendant would extend an offer to a candidate if the panel unanimously favored doing so, as it did with Plaintiff. Preston Dep. [59-3] at 14–15. As an MSA, Plaintiff was tasked with soliciting customers for the sale of products, informing customers about the features of Defendant's motorcycles, and "working to create a great buying experience for the customer and maximize the profitability" of the dealership. Def. SMF at ¶ 16.

Beginning in August 2017, Plaintiff was supervised by newly hired General Sales Manager Robert Hammers. *Id.* at ¶¶ 20–21. Hammers, along with Preston above him, stressed to the dealership's MSAs that they were expected to report to work on time and as scheduled, that they make productive use of their time at work, and that they work cohesively as a team. *Id.* at ¶¶ 22–23. Hammers and Preston additionally stressed that MSAs were expected to comply with directions given to them by their supervisors, including those given by the General Manager of the

dealership. *Id.* at ¶ 24. According to Defendant, Preston and Hammers often observed that Plaintiff would not follow directions given to him by them or by other supervisors. Def. SMF at ¶ 26 (citing Preston Decl. [63] at ¶ 10). Plaintiff denies that he had a tendency to not follow directions, citing testimony from Clarence Moon, a sales manager who supervised him, who stated that he "would not characterize [Plaintiff] as a person who would refuse to take direction from management, including me as his sales manager." Pl. Resp. SMF at ¶ 26; Moon Decl. [69-2] at ¶¶ 5–6. Defendant also claims that Hammers and Preston frequently observed Plaintiff failing to contact customers in order to make productive use of his downtime, as instructed by management. Def. SMF at ¶¶ 27, 29. Plaintiff likewise refutes this observation, citing, among other things, his testimony that he made customer calls in an amount comparable to other members of the sales team. Pl. Resp. SMF at ¶ 29. Hammers and Preston's further alleged misgivings with Plaintiff's performance include his failure to report to work early enough to assist with pre-opening tasks, his refusal to take on non-sales tasks on the grounds that his sales numbers were high, and his abnormally frequent disputes with other MSAs over clients and commissions. Def. SMF at ¶¶ 30–31, 33–34. Plaintiff denies all of these contentions, citing to his testimony that he consistently complied with scheduling mandates and assisted with non-sales tasks and noting that Hammers and Preston did not personally handle any of his disputes with other MSAs such that they

would be able to discern that he caused disputes with his co-workers or engaged in them more frequently than others. Pl. Resp. SMF at ¶¶ 30–31, 33–34.

Defendant claims that, on September 18, 2017, Plaintiff left work before the end of his scheduled shift without notifying Hammers or any other supervisor, and that Hammers accordingly issued Plaintiff a written reprimand. Def. SMF at ¶¶ 39–40. Plaintiff denies having left work early that day and testifies that he was never issued the written reprimand. Pl. Resp. SMF at ¶ 39. Defendant contends that, on November 17, 2017, Hammers issued Plaintiff another written disciplinary action in response to his failure to report to work on time. Def. SMF at ¶ 41. Plaintiff admits to having been tardy and having received the disciplinary action. Pl. Resp. SMF at ¶ 41. The parties agree that Hammers intended to issue Plaintiff another written disciplinary action for tardiness in late 2017 and that Hammers instead rescinded the write-up. Def. SMF at ¶ 42; Pl. Resp. SMF at ¶ 42. Defendant claims that Hammers did so "in order to show Plaintiff that Hammers wanted to move forward with him in a positive manner." Def. SMF at ¶ 42. Plaintiff claims that multiple coworkers also arrived late the same day as the putative write-up and that Hammers rescinded the action upon being notified that he was treating Plaintiff unfairly in comparison. Pl. Resp. SMF at ¶ 42.

Later that month, on December 15, Hammers completed an evaluation of Plaintiff's performance. Def. SMF at ¶ 43; Hammers Decl. Exh. E [62]. The

evaluation form listed 14 performance categories and prompted Hammers to note whether Plaintiff met or exceeded his expectations, or whether Plaintiff needed improvement. Hammers Decl. Exh. E [62]. Under the "Knowledge of Required Skills" category, Hammers noted that Plaintiff exceeded expectations. *Id.* Hammers noted that Plaintiff met expectations in the following seven categories: "Quality of Work"; "Work Habits"; "Initiative"; "Uses Good Judgment"; "Personal Appearance"; "Punctuality"; and "Attendance." *Id.* He noted that Plaintiff needed improvement in the following six categories: "Acceptance & Implementation of Suggestions"; "Amount of Work Performed"; "Adjusts to Work Situation"; "Attitude & Cooperation"; "Productivity"; and "Dependability." *Id.* The same day, Hammers met with Plaintiff to discuss the evaluation. Def. SMF at ¶ 45. In a comment box on the evaluation form, Plaintiff wrote that he was "being threatened by [Hammers] and [that he was] feeling harassed." Hammers Decl. Exh. E [62].

Around the same time, Plaintiff sent his co-workers pictures of dealership motorcycles which he had arranged in reindeer formation. Pl. Resp. SMF at ¶ 49. On December 13, 2017, he sent the message "Who is this" to one of the phone numbers from the group message. Pl. Dep., Pl. Exh. 7 [61]. The holder of the phone number, whose identity was unknown to Plaintiff at the time, responded "I don't know why you sent me these pictures can you ride a deer???? I can't believe you don't remember me after all the things we did." *Id.* The message ended with several

emojis, including an eggplant, a peach, a dinner plate, and several emojis depicting dripping water. *Id.* Plaintiff responded "Huh," to which the phone number replied "How u gonna forget like that…It wasn't memorable for me neither that's why i didnt call." *Id.* Plaintiff then responded "Shidd you a damn lie." *Id.* The phone number then sent to Plaintiff a picture of a can of Vienna Sausages, captioned "And it wasn't that damn cold." *Id.* In response, Plaintiff asked again "Who is this dammit." *Id.* The phone number stated "Oh shit that was a picture of my mom." *Id.* Plaintiff again asked "Who is this." *Id.* The phone number then sent what appeared to be a picture of a fully naked transgender woman, captioned "Do u remember now?????," to which Plaintiff replied "Fuck out of here. Who is this," and "Stop playing." *Id.*

At some point before January 5, 2018, a co-worker informed Plaintiff that the phone number from which he had received the above-described messages belonged to Monique Perry, who worked as a motor clothes manager in the dealership's general merchandise section. Pl. Resp. SMF at ¶¶ 49, 56; Def. SMF at ¶ 56. Plaintiff testifies that, at some point before she had sent the text messages, Perry had made other lewd comments toward him. These comments included Perry asking Plaintiff "Is that one of your hoes, too?" after seeing a female customer enter the dealership and telling Plaintiff that he "shouldn't be having those all-nighters" after seeing him yawn. Pl. Resp. SMF at ¶ 49. On January 5, 2018, Plaintiff emailed Defendant's

Human Resources Manager, Jeanne Chambers, to report Perry's alleged sexual comments and text messages. Def. SMF at ¶ 47.

Chambers immediately notified Preston of Plaintiff's email and scheduled a meeting with Plaintiff for January 8, 2018, which was the following Monday. *Id.* at ¶¶ 50–51. On January 8, Chambers met with Plaintiff, alongside Hammers, Preston, and Betty Preston, who is married to Preston and worked at the dealership. *Id.* at ¶ 52. Perry also joined the meeting and admitted that she made the alleged comments and text messages. *Id.* at ¶¶ 53–54. She promised not to engage in similar conduct any further. *Id.* at ¶ 54. Preston told Perry that her behavior was unacceptable and in violation of the dealership's policies, and that she would be terminated if she engaged in similar conduct in the future. *Id.* With Perry in the room, Preston then asked Plaintiff if he was uncomfortable continuing to work with her. *Id.* at ¶ 55; Pl. Resp. SMF at ¶ 55. Plaintiff stated that he would not be uncomfortable and that he could continue to work with her. Pl. Resp. SMF at ¶ 55. Plaintiff testifies that he said so only because he did not want to have the responsibility of determining the fate of Perry's employment in front of her. *Id.* Plaintiff did not have any further incidents with Perry after the January 8 meeting.

The same day, after the meeting concerning Perry, Plaintiff met with Preston, Hammers, and Chambers to discuss Plaintiff's disagreement with Hammers' December 2017 evaluation. Def. SMF at ¶ 58. At the conclusion of the meetings,

Preston asked Plaintiff to meet with Chambers to discuss any additional matters that he may have felt uncomfortable discussing in front of Perry and/or Hammers. *Id.* at ¶ 61.

On February 20, 2018,[1] over an hour after he was required to report to work, Plaintiff called a sales manager to inform him that he was having car trouble. *Id.* at ¶ 63. In response to Plaintiff's failure to report to work that day, Hammers issued Plaintiff another written disciplinary action. *Id.* at ¶ 66. The written action suspended Plaintiff without pay for five days between February 20 and February 24, a punishment Preston and Hammers agreed to enact. *Id.* at ¶ 67; Hammers Decl. Exh. G [62].

In March 2018, Preston hired Jeff Lewis to be the dealership's General Manager. Def. SMF at ¶ 68. The parties agree that Lewis had a "brusque management style" and a "quick temper" and that he often spoke harshly to employees. *Id.* at ¶ 69. Preston and Hammers observed Lewis speaking harshly to both African-American and Caucasian employees. *Id.* at ¶ 74. Some employees, however, say that Lewis reserved particularly harsh comments toward African-

---

[1] Although both parties agree that the relevant incident occurred on February 20, 2018, the Notice of Disciplinary Action to which they cite lists the date of the incident as February 17, 2018. Hammers Decl. Exh. G [62]. The Notice itself was dated February 20. *Id.*

American employees and customers. Pl. Resp. SMF at ¶ 69. Mike Davis, an MSA at the dealership, testifies that he heard Lewis regularly state that Plaintiff and an African-American sales manager were "shucking and jiving" when describing their work around the dealership. Davis Aff. [69-1] at ¶ 4(a). Davis states that he heard Lewis call Plaintiff a "homeboy" and say that Plaintiff was "blacker" than the rest of the employees because he was "acting like a street person." *Id.* at ¶ 4(c). Davis further testifies that he observed Lewis insult and berate Plaintiff for "minor and trivial things." *Id.* at ¶ 5. Jameson Previte, a white employee, testified that Lewis criticized him for dressing "urban," which Lewis stated made him look like a "customer." Previte Dep. [69-3] at 17–18. Previte states that the dealership's customer base was "predominately African-American." *Id.* Davis further attests to hearing Lewis refer to a black customer as a "credit criminal." Davis Aff. [69-1] at ¶ 6. Tammie Landis, a dealership employee, wrote in a May 2018 human resources complaint that Lewis asked her if a potential customer was white or black when she sought instruction on how to handle a situation regarding the customer. Pl. Dep. Exh. 27 [61]. Previte testifies to overhearing the exchange. Previte Dep. [69-3] at 17–18.

Hammers claims that, in the months following Hammers' December 2017 evaluation of Plaintiff, he did not see an improvement in Plaintiff's work performance. Def. SMF at ¶ 75. On April 18, 2018, Plaintiff's employment with the dealership was terminated. Def. SMF at ¶ 77; Pl. Resp. SMF at ¶ 77. The parties

dispute the circumstances surrounding the termination. Defendant contends that Hammers recommended that Plaintiff be terminated, that Lewis supported Hammers's recommendation, and that Preston gave final approval to the recommendation. Def. SMF at ¶ 76. Plaintiff contends that Lewis had a greater role in his termination, citing testimony from Chambers that it was Lewis who first contacted her to let her know that he "wanted to let [Plaintiff] go." Pl. Resp. SMF at ¶ 76. Defendant also contends that Plaintiff was informed at the time of his termination that he was being terminated "because [of] his on-going conduct and poor attitude." Def. SMF at ¶ 77. Plaintiff denies that he was given any reason for his termination, testifying that when he asked why he was being terminated, Hammers responded "We are moving in a different direction." Pl. Resp. SMF at ¶ 77. When Plaintiff asked if he did anything to prompt his termination, he testifies that Hammers stated "You didn't do anything. We are just moving in a different direction." *Id.* Plaintiff's termination letter did not state a reason for his termination. Pl. Dep. Exh. 20 [61]. Previte testifies that, the day after Plaintiff's termination, Lewis stated that Plaintiff was terminated in part because "he wanted to wear [For Us, By Us ("FUBU") branded clothing] to work every day." Previte Dep. [69-3] at 11. Previte testifies that FUBU is an African-American-owned clothing brand. *Id.* at 17.

## II.   DISCUSSION

### A.    *Summary Judgment Standard*

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to

13

defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* An issue is not genuine if it is unsupported by evidence or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 242. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See id.* at 249; *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable

substantive law identifies those facts that are material and those that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

> B.   *Plaintiff's Claims*

>> 1.   Hostile Work Environment

In Count I of his Amended Complaint, Plaintiff alleges that, as a result of Perry's conduct, he was subject to a sexually hostile work environment in violation of Title VII. *See* Am. Compl. [27] at ¶¶ 24–41.

Title VII provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). An employer is liable for a violation of Title VII based on sexual harassment when the harassing conduct "unreasonably interferes with an employee's job performance by creating a hostile, intimidating, or offensive work environment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65 (1986). Thus, a plaintiff may establish that she was discriminated on the basis of her sex in violation of Title VII by proving that she was harassed on the basis of her sex and that such harassment affected a condition of her employment. *Meritor Sav. Bank*, 477 U.S. at 66; *Henson v. City of Dundee*, 682 F.2d 897, 902–04 (11th Cir. 1982). As the United States Supreme Court has stated:

> [T]he language of Title VII is not limited to "economic" or "tangible" discrimination. The phrase "terms, conditions, or privileges of employment" evinces a congressional intent to "'strike at the entire spectrum of disparate treatment of men and women'" in employment.

*Meritor Sav. Bank*, 477 U.S. at 64 (internal citations omitted). Thus, Title VII grants employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult. *Id.* at 65.

Courts have recognized two distinct types of sexual harassment violations. Sexual harassment may violate Title VII when the harassment: (1) involves the conditioning of concrete employment benefits on sexual favors (*i.e.*, what has been traditionally called *quid pro quo* sexual harassment), or (2) creates a hostile or offensive working environment, even if not affecting economic benefits. *See Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir. 1989). Under the first theory, the plaintiff must prove that the harassment culminated in a "tangible employment action" against her, while under the second or "hostile work environment" theory, the plaintiff must prove that she suffered "severe or pervasive conduct." *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753–54 (1998)).

In order to establish a *prima facie* case for a Title VII hostile work environment claim against an employer, a plaintiff must show that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the

harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) there is a basis for holding the employer liable for the harassment either directly or indirectly. *See Reeves v. C.H. Robinson Worldwide, Inc.,* 594 F.3d 798, 808 (11th Cir. 2010) (*en banc*); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (*en banc*); *Cross v. Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Henson v. City of Dundee*, 682 F.2d 897, 903–05 (11th Cir. 1982); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762–63 (1998).

To demonstrate the fourth element of a *prima facie* case of a hostile work environment, a plaintiff must be able to show that his work environment was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). A court must consider the "totality of the circumstances" in determining whether a hostile environment is severe or pervasive enough to be actionable under Title VII; it must consider not only the frequency of the incidents alleged but also the gravity of those incidents. *Harris*, 510 U.S. at 23; *Vance v. S. Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1511 (11th Cir. 1989). Other factors that are relevant are whether the offensive

17

conduct is physically intimidating or humiliating, and whether it unreasonably interferes with plaintiff's work performance. *Harris*, 510 U.S. at 23.

As the Supreme Court has stated, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (citation omitted). In evaluating whether a reasonable person would find conduct to be sufficiently severe or pervasive, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *see also Mendoza*, 195 F.3d at 1246 ("[C]ourts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.").

The parameters of the fifth element of a harassment claim under Title VII— the employer's liability for any harassment—"depend[s] on the status of the harasser." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). If the alleged harasser is a supervisor, that is, a person otherwise "empowered by the employer to take tangible employment actions against" the plaintiff, the employer is presumed to be vicariously liable for the harasser's conduct. *Id.*; *see Terry v. Laurel Oaks*

*Behavioral Health Ctr., Inc.*, 1 F. Supp. 3d 1250, 1266 (M.D. Ala. 2014). The employer may escape vicarious liability only by establishing the affirmative defense set out by the Supreme Court in *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). The *Ellerth/Faragher* defense requires an employer to show "that (1) it exercised reasonable care to prevent and promptly correct harassing behavior, and (2) the employee unreasonably failed to take advantage of the employer's preventative and corrective opportunities or to otherwise avoid harm." *Swindle v. Jefferson Cty. Comm'n*, 593 F. App'x 919, 923 (11th Cir. 2014) (*per curiam*). If the alleged harasser is not a supervisor of the plaintiff, however, the employer is not presumptively vicariously liable for their conduct. Rather, if the harasser is the plaintiff's "co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance*, 570 U.S. at 424. In other words, in order for the employer to be liable, the plaintiff must establish that the employer knew or should have known about the co-worker's conduct but failed to act to stop it. 29 C.F.R. § 1604.11(d).

Defendant argues that Plaintiff cannot establish the fourth and fifth elements of his hostile work environment claim. Defendant contends that Perry's conduct toward Plaintiff was not sufficiently severe or pervasive enough to constitute actionable harassment because they were isolated incidents by a co-worker (not a

supervisor) and "were meant by her to be jokes." Mot. Summ. J. [59-1] at 20. Further limiting the severity of Perry's conduct, says Defendant, is the fact that Perry never inappropriately touched Plaintiff and did not sexually proposition him in any manner. *See id.* As for its liability, Defendant argues that Perry had no supervisory authority over Plaintiff, worked in a separate department unable to affect his employment, and it immediately acted to stop the conduct once Plaintiff complained. *See id.* As such, it alleges that it cannot be liable for Perry's conduct because Plaintiff cannot show it was negligent in its response to it.

Plaintiff argues that the severity and pervasiveness of Perry's conduct is evident in the fact that one of his co-workers, Kandy Branch, approached him to tell him the origin of the text messages and in Preston's acknowledgement that Perry's conduct was inappropriate. *See* Resp. [68] at 20. He argues that the severity of her conduct is further underscored by the humiliation he felt as a result of her conduct. *See id.* As for liability, Plaintiff responds that Defendant is vicariously liable for Perry's harassment because Betty Preston had a supervisory role at the dealership, was aware of Perry's conduct, and failed to exercise reasonable care in response to it. *See id.* at 20–22. Plaintiff additionally argues that Perry herself must be considered a supervisor because she sometimes sat on the dealership's hiring panels, which required unanimous consent to hire a candidate. *See id.* at 20.

Whether or not Perry's conduct was severe or pervasive enough to be actionable, Plaintiff has failed to establish that Defendant could be liable for it. Neither of Plaintiff's arguments for vicarious liability are viable. Betty Preston's status as a supervisor is irrelevant to whether Defendant can be vicariously liable for Perry's conduct, except insofar as Plaintiff argues that Defendant's response to Perry's conduct was negligent. Rather, it is Perry's status that determines whether Defendant is vicariously liable for her actions absent an affirmative defense. As for her, it is irrelevant that she sat on some of Defendant's hiring panels. The status of an employee as a supervisor for purposes of harassment liability under Title VII turns on whether "the employer has empowered that employee to take tangible employment actions *against the victim*[.]" *Vance*, 570 U.S. at 431 (emphasis added). It is only when an employee has supervisory authority, the "potential use [of which] hangs as a threat *over the victim*—that vicarious liability . . . is justified." *Id.* at 440 (emphasis added). Although Perry may have had authority over some candidates' hiring, there is no evidence in the record that Perry controlled Plaintiff's hiring or had any semblance of other supervisory authority over Plaintiff at any time, let alone the time that the alleged harassment occurred. Indeed, Perry worked in an entirely different department from Plaintiff. *See* Pl. Resp. SMF at ¶ 48.

Thus, Defendant can be held liable for Perry's conduct only to the extent Plaintiff can show that it was negligent in responding to it. *See Miller v. Kenworth*

*of Dothan, Inc.*, 277 F.3d 1269, 1278 (11th Cir. 2002). Plaintiff contends that Defendant was negligent in its response because it allegedly took no immediate action after he initially reported Perry's conduct. *See* Resp. [68] at 21–22. In addition to his January 5, 2018 email to Chambers, Plaintiff asserts that, at some point before then, another co-worker informed Betty Preston about the messages that Perry had sent Plaintiff and that Betty Preston took no action. *See id.* According to Plaintiff, Betty Preston's alleged failure to respond to learning of Perry's conduct was negligent. Defendant objects that the sole item of evidence Plaintiff relies on in asserting that a co-worker told Betty Preston of Perry's conduct before January 5—Plaintiff's January 5 email to Chambers in which he states as much—is inadmissible hearsay. *See* Reply [73] at 3 n.2. Plaintiff responds that his email to Chambers falls within the business record exception to the prohibition against hearsay. *See* Sur-reply [80] at 7.

Whether or not Plaintiff's statement that Betty Preston knew of Perry's conduct is inadmissible hearsay, even assuming the fact in Plaintiff's favor could not establish negligence and liability on the part of Defendant. Under Title VII, "[i]f an employer has . . . notice of harassment but takes immediate and appropriate corrective action, the employer is not liable for the harassment." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1261 (11th Cir. 2003) (citing *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1280 (11th Cir. 2002)). Proper corrective action is that

which is reasonably likely to prevent harassment from recurring. *See Wilcox v. Corr. Corp. of Am.*, 892 F.3d 1283, 1288 (11th Cir. 2018). The promptness and effectiveness of any corrective action is determined on a case-by-case basis. *See id.*; *Johnson v. Austal, U.S.A., L.L.C.*, 805 F. Supp. 2d 1299, 1317 (S.D. Ala. 2011).

Plaintiff does not indicate the date on which Betty Preston allegedly knew of Perry's conduct. In his email to Chambers, he notes that Betty Preston was notified by his co-worker "later," after Perry's December 13, 2017 text messages. *See* Chambers Dep. Exh. 6 [81-1]. At earliest, then, Betty Preston could have known of Perry's conduct three weeks prior to Plaintiff's January 5 complaint to Chambers. It is undisputed that within weeks of Betty Preston's alleged knowledge of Perry's conduct—and within three days of Plaintiff's email to Chambers—Defendant organized a meeting between Plaintiff, Gene Preston, Betty Preston, Hammers, Chambers, and Perry in which Perry was reprimanded for her conduct and threatened with termination should she repeat it. Def. SMF at ¶¶ 52–54. There is no indication that, after the January 8, 2018 meeting, Perry ever again behaved in a sexually crude manner toward Plaintiff.

Plaintiff insists that Defendant could have acted sooner. But "Title VII does not require an employer to take the most effective action to avoid liability." *Curry v. Koch Foods, Inc.*, No. 2:16-CV-02008-SGC, 2019 WL 1281196, at *14 (N.D. Ala. Mar. 20, 2019) (citing *Fuller v. Caterpillar, Inc.*, 124 F. Supp. 2d 610, 617

23

(N.D. Ill. 2000)). Thus, it is of no matter whether Defendant theoretically could have acted a couple of days or weeks more quickly, especially given that Betty Preston was on notice of, at most, a single incident between Plaintiff and Perry. *See Noviello v. City of Boston*, 398 F.3d 76, 97 (1st Cir. 2005) (finding that an employer's delay of several days in addressing an alleged harasser's conduct could not constitute negligence absent "extreme circumstances"). The only relevant inquiry, rather, is whether Defendant promptly took "action reasonably likely to prevent a recurrence of the harassment." *Curry*, 2019 WL 1281196, at *14. That much it indisputably did.

Accordingly, Defendant is due summary judgment on Plaintiff's claim of harassment in violation of Title VII.

### 2.   Retaliation and Race Discrimination

#### a.   Standards of Proof Under Title VII and § 1981

As noted above, Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In addition to prohibiting discrimination based on an employee's race, color, religion, sex, and/or national origin, Title VII prohibits employers from retaliating against employees because of their opposition to

practices made unlawful under the statute or their participation in related investigations or enforcement proceedings. *Id.* at § 2000e-3(a).

Similarly, § 1981 provides that "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens[.]" 42 U.S.C. § 1981. It is well-settled law that the statute prohibits race discrimination in both the public and private employment context. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 961 (11th Cir. 1997); *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991) ("The aim of the statute is to remove the impediment of discrimination from a minority citizen's ability to participate fully and equally in the marketplace."); *see also St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609 (1987) ("Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts."). Further, § 1981 encompasses claims of race-based retaliation as well as claims of race discrimination. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008); *see also Bryant v. Jones*, 575 F.3d 1281, 1301 (11th Cir. 2009).

It is well-settled law that § 1981 prohibits race discrimination in both the public and private employment context. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 961 (11th Cir. 1997) ("It is well-established that § 1981 is concerned with racial discrimination in the making and enforcement of

contracts."); *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991) ("The aim of the statute is to remove the impediment of discrimination from a minority citizen's ability to participate fully and equally in the marketplace."); *see also St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609 (1987) ("Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts.").

In cases in which a plaintiff has asserted a claim under § 1981 as a remedy for race discrimination in the employment context, the elements required to establish a claim under § 1981 generally mirror those required for a Title VII claim. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (the same analysis applies to a Title VII race discrimination claim and a § 1981 race discrimination claim because both statutes "have the same requirements of proof and use the same analytical framework"); *see also Howard v. B.P. Oil Co.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994); *Brown*, 939 F.2d at 949. Accordingly, any standards of proof for Plaintiff's claim of race discrimination under Title VII also apply to his claim of race discrimination brought under § 1981.

Discrimination claims "are typically categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). An employee can succeed on a mixed-motive claim under Title VII by showing that illegal bias was a motivating factor for an adverse employment action,

even though other factors also motivated the action. *See id.* By contrast, single-motive claims, *i.e.*, pretext claims, require a plaintiff to show that bias was *the* true reason for the adverse action. *Id.* Claims of discrimination under § 1981 and claims of retaliation under Title VII may not proceed under a mixed motive theory; rather, plaintiffs asserting such claims must show that discrimination or retaliation was the but-for cause of the adverse employment action they suffered. *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020) (§ 1981); *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013) (Title VII retaliation). Both single-motive and mixed-motive claims can be established with either direct or circumstantial evidence. *Id.*; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To prevail on a claim for discrimination or retaliation, a plaintiff must prove that the defendant acted with discriminatory or retaliatory intent. *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 980–81 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). Discriminatory intent may be established either by direct evidence or by circumstantial evidence meeting the four-pronged burden-shifting test set out for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019) (*en banc*). Similarly, proof of unlawful retaliation may be in the form of direct evidence or circumstantial evidence generally governed by the *McDonnell*

*Douglas* burden-shifting framework *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir. 1986); *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162–63 (11th Cir. 1993).

Direct evidence is evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *Evidence, Black's Law Dictionary* 596 (8th ed. 2004); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993); *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir. 1989); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). Only the most blatant remarks whose intent could only be to discriminate, such as "the use of a racial slur or racially charged language," constitute direct evidence. *Ziyadat v. Diamondrock Hosp. Co.*, --- F.4th ---, 2021 WL 2934695, at *3 (11th Cir. July 13, 2021); *see Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 581. Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence. *See Harris v. Shelby Cty. Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996). "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641–42 (11th Cir. 1998).

Evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081–82 (11th Cir. 1990). Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent, which, like Plaintiff's FMLA claim, can be done using *McDonnell Douglas* burden-shifting framework outlined above. *See Holifield v. Reno*, 115 F.3d 1555, 1561–62 (11th Cir. 1997), *abrogated on other grounds by Lewis*, 918 F.3d at 1226; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527–28 (11th Cir. 1997). Under the *McDonnell Douglas* standard, a plaintiff may establish a *prima facie* case of discrimination by showing that (1) she is a member of a protected class; (2) she was subjected to an adverse employment action by her employer; (3) she was qualified to do the job in question, and (4) her employer treated similarly situated employees outside her protected classification (*i.e.*, those of a different race) more favorably than it treated her. *See McDonnell Douglas*, 411 U.S. at 802; *Evans v. Books-A-Million*, 762 F.3d 1288, 1297 (11th Cir. 2014); *Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999); *Holifield*, 115 F.3d at 1562. To establish a *prima facie* case of illegal retaliation, a plaintiff must show that: (1) she engaged in a protected activity or expression, (2) she received an adverse employment action, and (3) there was a causal link between the protected expression and the adverse action. *See, e.g., Wideman v. Wal-Mart Stores,*

29

*Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden Cty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).

Once a *prima facie* case has been established under the *McDonnell Douglas* framework, the employer must come forward with a legitimate non-discriminatory reason for its action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162–63 (11th Cir. 1993); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600–01 (11th Cir. 1986); *see also Weaver*, 922 F.2d at 1525–26. If the employer carries its burden of production to show a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reason offered by the defendant is merely a pretext for discrimination. *Goldsmith*, 996 F.2d at 1162–63; *Donnellon*, 794 F.2d at 600–01.

However, the *McDonnell Douglas* proof structure "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix v. WLCY Radio/Rahall*

*Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984), *abrogated on other grounds by Lewis*, 918 F.3d at 1226. Indeed, "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

Thus, a plaintiff may also defeat a motion for summary judgment by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted). As such, the Eleventh Circuit has held that a "plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Smith*, 644 F.3d at 1328). "Even without similarly situated comparators," a plaintiff will survive summary judgment if they present a convincing mosaic of circumstantial evidence from which a factfinder can infer discriminatory motivation. *Lewis*, 934 F.3d at 1185. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

b.      Retaliation

In Counts II and IV of his Amended Complaint, Plaintiff alleges that Defendant unlawfully retaliated against him in violation of Title VII and § 1981. *See* Am. Compl. [27] at ¶¶ 42–50.

As stated above, Plaintiff may present a claim of retaliation using the *McDonnell Douglas* burden-shifting framework. Defendant argues that Plaintiff cannot establish a *prima facie* case of retaliation because he did not engage in a protected activity, contending that his complaints to Preston, Hammers, and Chambers were not protected complaints of race discrimination. Mot. Summ. J. [59-1] at 24. Further, says Defendant, there is no evidence that any adverse act it took against Plaintiff were caused by his complaints. Defendant argues Plaintiff's February 2018 suspension was because of his attendance issues preceding it. *See id.* at 24–25. As for Plaintiff's allegation that Hammers wrongfully diverted his sales and/or commissions to other MSAs, Defendant contends that Plaintiff admits Hammers did so in order to help his "friend[s]" rather than for any retaliatory purpose. *Id.* Defendant further contends that it terminated Plaintiff for performance and attitude issues rather than for any retaliatory purpose. *Id.* Defendant argues that Plaintiff cannot adduce evidence that any of its reasons for its actions were pretextual, as he is required to do under the *McDonnell Douglas* standard.

In his response brief, Plaintiff contends that he engaged in protected activity on December 15, 2017, when he complained that he felt "threatened and harassed" by Hammers "about a work matter for personal reasons." Resp. [68] at 23. Plaintiff argues that his February 2018 suspension was in retaliation against his December 2017 complaint. *Id.* To the extent that Defendant offers a non-retaliatory justification for his suspension, Plaintiff argues, without elaboration, that "it is pretext given Defendant's failure to comply with its own policy on this issue." *Id.* (citing *Connor v. Sun Trust Bank*, 546 F. Supp. 2d 1360, 1364–75 (N.D. Ga. 2008)). Plaintiff presumably refers to Defendant's policy requiring employees who will be absent from or late to work to notify their manager "in advance" or as soon as possible, Pl. Exh. 12 [81-5] at 1; Plaintiff contends that he did notify Defendant that he was having car trouble that would make him late to the shift that prompted his suspension, albeit over an hour after he was supposed to report to work, Def. SMF at ¶ 63. In his sur-reply brief, Plaintiff shifts gears and offers a new argument for why his retaliation claim can proceed, arguing that he engaged in protected activity on January 5, 2018, when he reported Perry's conduct to Chambers, and that his suspension was in retaliation for *that* complaint. *See* Sur-reply [80] at 8–10. Plaintiff further adds that Hammers diverted his sales or commissions to other MSAs in "hostility towards him for engaging in protected activity." *Id.* at 9.

33

As an initial matter, Defendant is correct that Plaintiff's December 15, 2017 complaint regarding Hammers is not protected activity. "To maintain a claim for retaliation [against opposition to an unlawful practice], an 'employee must, at the very least, communicate her belief that discrimination is occurring to the employer.'" *Mason v. Clayton Cty. Bd. of Educ.*, No. 1:06-CV-2761-CC, 2008 WL 11406167, at *11 (N.D. Ga. Sept. 30, 2008) (quoting *Webb v. R & B Holding Co.*, 992 F. Supp. 1382, 1389 (S.D. Fla. 1998)). Communicating a belief of discrimination is more than just complaining about general mistreatment. *See Smith v. Mobile Shipbuilding & Repair, Inc.*, 663 F. App'x 793, 800 (11th Cir. 2016) (*per curiam*) (distinguishing between complaints of racial discrimination and those of "general unfair treatment in the workplace"). An employee "'must reasonably convey that she is opposing discrimination based specifically on race, versus some other type of discrimination or injustice generally.'" *Henley v. Turner Broad. Sys., Inc.*, 267 F. Supp. 3d 1341, 1354 (N.D. Ga. 2017) (quoting *Cochran v. S. Co.*, No. 14-cv-0569, 2015 WL 3508018, at *2 (S.D. Ala. June 3, 2015)). While there is no requirement that any specific words be used in a protected complaint, an employer should not need to infer that an employee believes that the mistreatment they are complaining of is occurring because of a protected characteristic. *See Anderson v. Dunbar Armored, Inc.*, 678 F. Supp. 2d 1280, 1323 (N.D. Ga. 2009).

In his response to Hammers' December 2017 evaluation, Plaintiff complained, in relevant part, that: "This evaluation seems personal and business. Now I'm being threatened by my GSM and I'm feeling harassed." Hammers Decl. Exh. E [62]. Nothing in Plaintiff's complaint indicates that he felt threatened or harassed because of any protected characteristic of his, be it race or sex, notwithstanding his use of the words "threatened" and "harassed." *See Smith*, 663 F. App'x at 800 (employee's complaint that supervisor was "riding him and harassing him," without more, was insufficient to constitute complaint of discrimination); *Banks v. MarketSource, Inc.*, No. 1:18-CV-2235-WMR-JSA, 2019 WL 8277274, at *18 (N.D. Ga. Dec. 5, 2019), *report & rec. adopted by* 2020 WL 6291422 (N.D. Ga. Mar. 20, 2020) (use of the words "hostile work environment" and "harassing," without more, was insufficient to constitute complaint of discrimination). As such, Plaintiff cannot rely on his December 2017 complaint as protected activity sufficient to support a *prima facie* claim of retaliation.

In his sur-reply brief, Plaintiff raises his January 5, 2018 complaint to Chambers about Perry's conduct as the protected activity on which his retaliation claim rests. But even if the Court were to consider Plaintiff's January 2018 complaint a protected activity, and even if the Court were to find that the temporal proximity between that complaint and Plaintiff's suspension enough to warrant an inference of causation sufficient to establish a *prima facie* case, Defendant would still be due

summary judgment on Plaintiff's retaliation claim because Plaintiff has not offered evidence that Defendant's proffered reasons for suspending him were pretextual. As explained above, upon the showing of a *prima facie* case of retaliation, the *McDonnell-Douglas* framework requires that an employer must articulate a legitimate, nondiscriminatory reason for the adverse action of which a plaintiff complains. This is an "exceedingly light burden"—the employer's "burden is 'merely one of production, not proof.'" *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983) (quoting *Lee v. Russell Cty. Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir. 1982)). "So long as the employer articulates a 'clear and reasonably specific' non-discriminatory basis for its actions, it has discharged its burden of production." *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 769–70 (11th Cir. 2005) (*per curiam*) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981)). Defendant offers such a reason for Plaintiff's suspension: He was late to report to work and did not call to advise anyone of his car troubles until over an hour into his shift. Def. SMF at ¶ 63; Mot. Summ. J. [59-1] at 24–25.

As such, under the *McDonnell Douglas* framework, it is Plaintiff's burden to show that Defendant's proffered reasons are pretextual by showing that they have no basis in fact, that they were not the true factors motivating the decision, or that the stated reasons were insufficient to motivate the decision. *See Wisdom v. M.A. Hanna Co.*, 978 F. Supp. 1471, 1479 (N.D. Ga. 1997). He can either directly

persuade the Court that a discriminatory or retaliatory reason more likely motivated the employer or show indirectly that the employer's ultimate justification is not believable. *See Burdine*, 450 U.S. at 256; *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1522 (11th Cir. 1991).

In other words, Plaintiff may come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804; *see also Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1530 (11th Cir. 1997) ("In order to establish pretext, the plaintiff is not required to introduce evidence beyond that already offered to establish the *prima facie* case."). Comparator evidence may also be considered when evaluating whether the defendant's reasons for adverse employment action were pretextual. *See Rioux v. City of Atlanta*, 520 F.3d 1269, 1276–77 (11th Cir. 2008).

But Plaintiff cannot show that an employer's proffered reasons for suspending him were pretextual simply by "quarreling with the wisdom" of those reasons. *See Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quoting *Chapman*, 229 F.3d at 1030). A plaintiff may nevertheless establish pretext by demonstrating "such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont De Nemours & Co.*, 100 F.3d 1061, 1072 (3d Cir. 1996) (*en banc*)). However, "[a] reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Brooks*, 446 F.3d at 1163 (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Because Plaintiff bears the burden of establishing that Defendant's reasons are a pretext for discrimination or retaliation, he "must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). "Conclusory allegations of discrimination [or retaliation], without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions." *Young*, 840 F.2d at 830; *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993).

In this case, Plaintiff admits to engaging in the conduct for which Defendant claims it suspended him, that is, failing to notify management that he would be late and/or absent from work until over an hour after he was required to report to work. *See* Pl. Resp. SMF at ¶ 63. Plaintiff's sole argument as to pretext is that, by calling

and notifying Defendant of his car trouble, he arguably complied with Defendant's policy that requires employees who will be late to or absent from work to notify their manager in advance of their absence or as soon as otherwise possible. *See* Resp. [68] at 23. Defendant's alleged departure from this policy, Plaintiff contends, is evidence of pretext. *See id.* Although an employer's failure to follow their own internal operating procedures can be evidence of pretext, *see Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006), it is unclear how Plaintiff's conduct conformed to Defendant's rule regarding tardiness and/or absences such that his suspension would have been contrary to its policy. Defendant's attendance policy states that "[e]mployees who will be late to or absent from work should notify their manager *in advance*, or *as soon as possible* in the event of an emergency." Pl. Exh. 12 [81-5] at 1 (emphasis added). Plaintiff concedes that he did not notify his manager in advance of his shift that his car trouble would prevent him from reporting to work on time, and that he only did so almost two hours after he was required to report to work. It is unclear, then, how Defendant's determination that Plaintiff violated its attendance policy is at odds with the written policy, let alone that any departure from the written policy was so egregious as to warrant a finding of pretext. *See Caldwell v. Clayton Cty. Sch. Dist.*, 604 F. App'x 855, 863 (11th Cir. 2015) (*per curiam*) (finding that "minor discrepancies" between an employer's written policy and its actions were insufficient to establish pretext); *see also Langford v. Magnolia*

*Advanced Materials, Inc.*, 709 F. App'x 639, 641 (11th Cir. 2017) (*per curiam*) ("Title VII does not take away an employer's right to interpret its rules as it chooses[.]"). Plaintiff thus cannot ground his retaliation claim on his February 2018 suspension.

To the extent that Plaintiff argues that Hammers' alleged diversion of his sales and commissions to other MSAs was in retaliation for his January 2018 complaint against Perry, the undersigned likewise finds that Plaintiff has failed to present evidence indicating that Defendant's proffered rationale for the diversion is pretextual. Contrary to Plaintiff's argument that Defendant has not articulated a legitimate, non-discriminatory reason for Hammers' diversion of certain commissions and sales, Defendant notes that Hammers did so in order to benefit MSAs who were his "friends." Def. SMF at ¶¶ 92–94; Mot. Summ. J. [59-1] at 25. Title VII permits an employer to take action against an employee "for a good reason, a bad reason, . . . or for no reason at all," so long as it is not an unlawful one. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1149 (11th Cir. 2020) (*en banc*) (internal quotation omitted). Thus, whatever the wisdom of Defendant's rationale, it is enough to shift the burden to Plaintiff to offer evidence that it was not, in fact, the real reason for the action. However, in response to Defendant's argument, Plaintiff

does not identify a single piece of evidence indicating that Defendant's proffered justification was pretextual.[2]

Defendant is accordingly due summary judgment as to Plaintiff's retaliation claims.

### c.    Race Discrimination

In Count III of his Amended Complaint, Plaintiff alleges that his termination was the result of race discrimination in violation of Title VII and § 1981. *See* Am. Compl. [27] at ¶¶ 51–63.

Defendant argues that it is due summary judgment on Plaintiff's discrimination claim because he cannot establish a *prima facie* case of discrimination under the *McDonnell Douglas* standard and because it has offered unrebutted evidence that Plaintiff was fired for reasons other than his race. Defendant contends that Plaintiff's *prima facie* case fails because he has not

---

[2] In his sur-reply brief, Plaintiff advances an argument that his termination was also retaliatory, relying on a statement made by General Manager Jeff Lewis to the Equal Employment Opportunity Commission. *See* Sur-reply [80] at 12. Plaintiff failed to raise this argument in his response brief and has not afforded Defendant an opportunity to respond to it. It is thus not properly before the Court. *See Davis v. Legal Servs. of Ala.*, 472 F. Supp. 3d 1123, 1132 (M.D. Ala. 2020) (argument not raised in response to summary judgment motion deemed abandoned) (citing *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001)); *Coker v. Enhanced Senior Living, Inc.*, 897 F. Supp. 2d 1366, 1373 (N.D. Ga. 2012) (argument raised in sur-reply disregarded to the extent it addressed points raised in initial brief).

identified any similarly situated employees of another race who engaged in similar conduct but were nevertheless treated more favorably than he was. *See* Mot. Summ. J. [59-1] at 22–23. Defendant further contends that Plaintiff was terminated because of "ongoing attendance issues and issues with Plaintiff's attitude and willingness to take direction from his supervisors." *Id.* at 23. Defendant argues that several white employees were terminated for engaging in less severe misconduct than Plaintiff. Defendant claims, moreover, that Plaintiff cannot proffer the statements and conduct of General Manager Jeff Lewis as direct evidence of discrimination, on the grounds that his statements were not explicitly "racist" and that he did not make the ultimate decision to terminate Plaintiff. *See* Reply [73] at 13.

In response, Plaintiff contends that he has offered direct evidence that his termination was the result of race discrimination, pointing to Lewis's statement to Jameson Previte that Plaintiff was terminated in part because of his donning of FUBU brand apparel. *See* Resp. [68] at 24. Plaintiff's response brief does not dispute Defendant's argument that any *prima facie* case based on circumstantial evidence fails because of a lack of similarly situated comparator employees. In his sur-reply brief, however, Plaintiff proffers three alleged white comparators who were treated more favorably than he was: Walter Sulesky, Jameson Previte, and Robert Hammers. *See* Sur-reply [80] at 13–14. Plaintiff argues that all three, like him, were accused of "generalized performance issues." Sulesky is a former sales associate who, says

Plaintiff, was accused of not performing up to expectations, but was offered an opportunity to resign rather than be terminated, unlike Plaintiff. *See id.* Previte is a former finance manager who Plaintiff argues was terminated for absenteeism and tardiness, but only after being afforded "significant leeway"; Plaintiff claims that Previte was only terminated after 23 separate infractions. *See id.* at 14. Hammers, says Plaintiff, was also terminated after being accused of not "performing up to expectations," but only after declining an offer for a demotion, an option Plaintiff contends he was not afforded. *See id.* Plaintiff argues that Lewis was, in fact, a decisionmaker in the termination of Plaintiff's employment and that, even if he was not, his alleged racial animus toward Plaintiff can be imputed onto Preston—who formally terminated Plaintiff—under the "cat's paw" theory of liability. *See id.* at 14–15. As such, Plaintiff argues that Lewis's behavior toward him and other African-Americans and his statement that Plaintiff was terminated for wearing FUBU apparel serves as evidence of unlawful discrimination.

Plaintiff is incorrect that Lewis's statement that he was terminated for wearing FUBU apparel serves as direct evidence of racial discrimination. As stated above, direct evidence is evidence that, if taken as true, establishes discriminatory intent without any additional inference or presumption. As such, evidence that "is subject to more than one interpretation" is not direct evidence. *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (citing *Harris v. Shelby Cty. Bd. of Educ.*, 99

F.3d 1078, 1083 n.2 (11th Cir. 1996)). Although an employer's use of tropes "not expressly related to race" but nevertheless evocative of prejudicial stereotypes can serve as circumstantial evidence of discriminatory motivation, *see Banks v. MarketSource, Inc.*, No. 1:18-CV-2235-WMR-JSA, 2019 WL 8277274, at *15 (N.D. Ga. Dec. 5, 2019), *report & rec. adopted by* 2020 WL 6291422 (N.D. Ga. Mar. 20, 2020), such statements may not serve as direct evidence to the extent that they can be interpreted as non-discriminatory. Whatever the potential racial element of Lewis's comments regarding Plaintiff's apparel, it is not facially apparent from his comments and requires at least some inference to uncover. Lewis's comments thus cannot serve as direct evidence of discrimination.

Plaintiff therefore must utilize methods of presenting circumstantial evidence to sustain his discrimination claim. However, as Defendant argues, the *McDonnell Douglas* method of presenting a claim of discrimination based on circumstantial evidence is unavailable to Plaintiff because he has not proffered sufficient evidence that similarly-situated employees of a different race were treated more favorably than he was.

In *Lewis v. City of Union City*, the Eleventh Circuit expounded on the importance of robust comparison evidence for plaintiffs proceeding under the *McDonnell Douglas* framework. *Lewis v. City of Union City*, 918 F.3d 1213, 1221–24 (11th Cir. 2019) (*en banc*). Evidence that an employer "has treated like employees

differently" is necessary to "supply the missing link and provide a valid basis for inferring unlawful *discrimination*" through use of the framework. *Id.* at 1223 (emphasis in original). A plaintiff is "like" other employees only when "she and her comparators are similarly situated in all material respects." *Id.* at 1224. While a plaintiff need not show that she and her comparator are "nearly identical" in their circumstances, they should be similar in the legitimate circumstances that may have factored into their employer's decision to act adversely toward them, such as their conduct, their work histories, and the supervisors and/or policies under which they operate. *See id.* at 1225–28. Without such a comparator, a plaintiff cannot generally establish a *prima facie* case under the *McDonnell Douglas* framework. *Id.* at 1224.

Plaintiff fails to cite the controlling standard set forth in *Lewis* and fails to show that, under that standard, Sulesky, Previte, and Hammers are employees who can be proffered as comparators. Plaintiff contends that Sulesky, a fellow former sales associate, was accused of "not performing up to expectations," just as Plaintiff was. Sur-reply [80] at 13–14. However, Plaintiff was not, as he claims, accused of "generalized performance issues." *Id.* Rather, Defendant justified Plaintiff's termination on the specific grounds of his alleged absenteeism and attitude toward supervisors. Plaintiff's argument leaves unclear what, exactly, was allegedly deficient in Sulesky's performance and how they compare to Plaintiff's alleged deficiencies. For the same reason, the Court cannot conclude that Hammers, a sales

manager, was similarly situated to Plaintiff—Plaintiff argues only that Hammers was accused of "not performing up to expectations." Further, unlike Plaintiff, Hammers occupied a managerial role within the dealership. *See Vinson v. Tedders*, 844 F. App'x 211, 214 (11th Cir. 2021) (*per curiam*) ("Although not dispositive, a different in job title can reflect a difference in responsibilities."); *Menefee v. Sanders Lead Co., Inc.*, 786 F. App'x 963, 968 (11th Cir. 2019) (*per curiam*) (rejecting proffered comparators because they did not "have a similar position" within the employer as the plaintiff); *Smith v. City of Birmingham*, No. 2:17-cv-00983-JHE, 2019 WL 4600056, at *8 (N.D. Ala. Sept. 23, 2019) (finding a manager to occupy a role too dissimilar to that of a line employee to function as a valid comparator under *Lewis*). Previte's role is even further afield from that of Plaintiff: Although Previte is alleged to have had similar attendance issues, he occupied a managerial role in the dealership's finance department, rather than its sales department. *See Gilliam v. U.S. Dep't of Veterans Affairs*, 822 F. App'x 985, 991 (11th Cir. 2020) (*per curiam*) (noting that a proffered comparator was too dissimilar from a plaintiff in part because they worked in a different department within their employer). Without any comparators with whom he is similarly situated in all material respects, Plaintiff cannot advance a *prima facie* claim of race discrimination under the *McDonnell Douglas* framework.

Nevertheless, the Eleventh Circuit has reiterated that a "plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Lewis v. City of Union City* ("*Lewis II*"), 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). "Even without similarly situated comparators," a plaintiff will survive summary judgment if they present a convincing mosaic of circumstantial evidence from which a factfinder can infer discriminatory motivation. *Lewis II*, 934 F.3d at 1185. This can "be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . ., and other bits and pieces from which an inference of discriminatory intent may be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Id.* (quoting *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 733–34 (7th Cir. 2011)). While the "convincing mosaic" method bears similarities to the *McDonnell Douglas* method, it operates as a totality-of-circumstances test rather than a rigid step-by-step analysis.

Plaintiff's summary judgment briefing is terse and fails to even use the phrase "convincing mosaic." Plaintiff, however, makes at least a general argument that sounds in the totality-of-the-circumstances. Plaintiff cites Lewis's statements, some of which clearly show racial animus (e.g., referring to Plaintiff as "blacker"), and others of which were at least arguably racist, including at least one statement directly

referring to the termination decision itself. Plaintiff also cites the somewhat shifting reasons given for his termination. While Plaintiff could and should have presented his arguments more thoroughly, he has done at least the bare minimum to assert a general totality-of-circumstances theory of discriminatory intent.

In the end, the lack of any viable comparator evidence makes the question of summary judgment close and may prove to be an obstacle for Plaintiff at trial. But the Court cannot conclude that Plaintiff's remaining evidence is insufficient as a matter of law at this stage, at least under a totality-of-the-circumstances basis. Under Plaintiff's version of events, while he had prior write-ups for tardiness, absences and related misconduct, he did not face termination until Lewis took charge of the dealership. Defendant disputes the offensive things that Plaintiff attributes to Lewis, including derogatorily referring to Plaintiff as "blacker," saying that Plaintiff dressed like a "street person," saying that African-American customers were less worthy of credit, and criticizing another employee as also dressing too "urban." But the Court is obliged at this stage to accept Plaintiff's version of these facts and to view them in the light most favorable to him. Under that standard, the Court must see these comments as reflecting Lewis's racial animus against African-Americans generally and specifically because of stereotypes of how African-Americans dress. That Plaintiff was terminated so soon after this allegedly racist supervisor arrived is at least enough to raise an eyebrow.

More importantly, in the context of all of his other alleged comments, Lewis's alleged statement about firing Plaintiff because of Plaintiff's FUBU-branded clothing could itself be seen as evidence of discrimination. Specifically, in context, a jury could infer that Lewis's hostility to FUBU clothing was consistent with, and part of, his general hostility to things that he felt were too "urban" and made Plaintiff and others look "blacker."

To be sure, a supervisor can legitimately criticize overly-casual or unprofessional dress without being racist. But viewing the evidence in the light most favorable to Plaintiff, Lewis did not just criticize employees' clothing as unprofessional as a general matter. More narrowly, he expressed specific hostility to "urban" clothing and clothing that makes people look "blacker." In other words, the Court must infer that the hostility was directed principally at clothing that Lewis stereotypically attributed to African-Americans. Such comments by an individual involved in the termination decision are arguably enough on their own to survive summary judgment on a claim of race discrimination.[3]

---

[3] Defendant argues that Lewis was not the decision-maker regarding the termination. Plaintiff's evidence, however, is at least sufficient to get to a jury on this issue. Lewis was the General Manager over the entire dealership, including over Hammers, who claims to have made the initial decision to fire Plaintiff. One might expect the General Manager to be at least involved in termination decisions. Indeed, according to Plaintiff, Lewis was present with Hammers when Hammers explained that "we" are going in a different direction. *See* Pl. Resp. SMF at ¶ 77. Lewis also allegedly said that Plaintiff was terminated because of his "FUBU" clothing. *See*

But there is more. Shifting and inconsistent explanations for the termination, while typically analyzed as evidence of pretext, also can be considered as part of the totality-of-circumstances suggesting possible discriminatory intent. *See Lewis II*, 934 F.3d at 1186–87. Here, while Defendant claims that Hammers and Preston primarily made the termination decision based on Plaintiff's history of tardiness and disrespect, Hammers told Plaintiff something entirely inconsistent with this explanation, that is, "you didn't do anything," and that "we" are just "going in a different direction." Pl. Resp. SMF at ¶ 77. Lewis also stated that the termination was on account of Plaintiff's clothing, not because of misconduct. Previte Dep. [69-3] at 11. That the story itself keeps changing—or at least so a jury could find—is relevant to suggest discriminatory intent, at least in combination with the other facts set forth above, under a totality-of-the circumstances theory.[4]

---

Previte Dep. [69-3] at 11. That Plaintiff was arguably fired for a particular issue of concern to Lewis—overly "urban"-style clothing—could suggest that Lewis had a role in the decision.

[4] As noted, these inconsistent explanations, including Hammers's statement that Plaintiff "didn't do anything," and most especially Lewis's statement that Defendant was terminated because of his clothing, qualify as clear evidence of pretext, *i.e.*, that Plaintiff was not terminated for the conduct-related reasons that it now relies on. Thus, Plaintiff's evidence not only is arguably sufficiently to show discriminatory intent in the totality-of-circumstances, it also creates an issue of material fact as to pretext.

In the end, Plaintiff's case is not necessarily a strong one. After all, he was repeatedly written up for tardiness or absences or other problems prior to Lewis's arrival. And, as noted above, he cannot show that other employees of different racial backgrounds who were substantially similar in all material respects were treated more favorably. Nevertheless, the lack of comparator evidence is not fatal. And the question for the Court is not whether Plaintiff will necessarily or even likely win at trial. The question is whether he *could* win, if the jury sees the evidence in the light most favorable to him. The Court must answer that question in the affirmative, and thus recommend denial of summary judgment as to the claim of race discrimination.

## III. RECOMMENDATION

For the reasons discussed above, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [59] be **GRANTED IN PART AND DENIED IN PART**. Judgment should be entered in favor of Defendant on all of Plaintiff's claims except for the claims of race discrimination, which should proceed to trial.

As this is a Final Report and Recommendation, there is nothing further in this action pending before the undersigned. Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED** this 30th day of July, 2021.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE